(PRIZE.)

## The Astrea.

An enemy's vessel was captured by a privateer, recaptured by an-
other enemy's vessel, and again recaptured by another privateer,
and brought in for adjudication. It was held that the prize vested
in the last captor. An interest acquired in war, by possession, is de-
vested by the loss of possession.

APPEAL from the circuit court for the district of
Georgia. This was an enemy's vessel, captured by
the privateer *Ultor*, in sight of Surinam, on the 17th
of May, 1813 ; and on the 13th of June, 1813, re-
captured by an enemy's vessel of war, about two
leagues from the coast of Georgia, and, on the same
day, recaptured by the privateer *Midas*, and brought
into the port of Savannah, for adjudication. The
prize was adjudged to the last captors, by the decree
of the court below, from which the first captors ap-
pealed to this court.

*Charleton*, for the appellants, contended, that the
prize interest vested in the first captors. He argued,
that the opinions of eminent civilians, and the prac-
tice of the continental nations of Europe, ought to
prevail, rather than the decisions of the British
courts of prize ; which last are founded on reasons of
commercial and naval policy, peculiar to England.
Sir William Scott himself admitted, that there is no

general rule,[a] but adopted the rule of condemnation, as most convenient for his own country; because, by protracting the period for the devesture of British interests, it places the property of British subjects upon a better and more secure footing than the rule adopted by any other nation. It gives a wider range to the *jus postliminii*, and enlarges the probability of recapture; a probability, which is converted almost into a certainty, by the maritime strength of Great Britain. Other nations, not having the same means of giving protection and security to captures, have adopted rules requiring a less firm and shorter possession, in order to devest the property. These rules are, 1st. That of immediate possession. 2d. That of pernoctation and twenty-four hours possession. 3d. The bringing *infra præsidia*.[b] The first is held sufficient by *Azuni;*[c] and though his own opinion is entitled to but little weight, it deserves consideration how far he is supported by authorities. It is the maxim of the civil law, that things taken from the enemy immediately become the property of the captors. *Quæ ex hostibus capientur* STATIM *capientium fiunt.* Grotius and Vattel are guilty of great inconsistencies in expounding the rule in question. Burlamaqui is clear and explicit, that mere possession immediately vests a title.[d] Bynkershoek does not require a sentence of condemnation

*a* 1 *Rob.* 50. The Santa Cruz.

*b Wheaton on Captures,* c. 8. s. 14, 15. 17, 18.

*c* 2 *Azuni,* 236.

*d Burlam. Nat. and Pol. Law,* 222.

and he enumerates " fleets" among the *præsidia*, un- der· the protection of which the thing taken may be considered as safe;[e] so that a bringing into the territorial limits is not indispensable, because the fleet into which the captor brings his prize may be remote from the coasts of his country. It results, then, that the loss of the *spes recuperandi* is the true foundation of the rule established by jurists: it is this which consummates the title of the captors, and destroys the *jus postliminii* of the law of nations; it is the municipal code of England alone which re- quires a sentence of condemnation to perfect the title. 2. But, supposing the *jus postliminii* still to continue, it is a right to be asserted by the subjects of the state from whom the property has been cap- tured. But is it competent for one citizen of the belligerant state to devest another of the incipient inchoate title he had acquired by the first capture ? The recapture by the enemy might, indeed, enable the original owner to reclaim his property ; if a sen- tence of condemnation be necessary, it might affect the title of a neutral purchaser ; but the *jus postli- minii* can have no operation as between the first and second captors.

*Harper*, contra, was stopped by the court.

MARSHALL, Ch. J. An interest acquired by pos- session, devested by the loss of possession from the very nature of a title acquired in war. The law of

[e] *Bynk. Q. J. Pub.* c. 3. p. 29. of Du Ponceau's Translation.

1816.

The Astrea.

March 4th

our own country, as to salvage, settles the question, and the case of the Adventure' is directly in point and conclusive.

Sentence of the circuit court affirmed.

f February Term, 1814.—This was the case of a British ship captured by two French frigates, and, after a part of the cargo was taken out, presented to the libellants in the cause, citizens of the United States, (then neutral,) whose vessel the frigates had before taken and burnt; by whom she was navigated into a port of this country, and, pending the suit instituted by them, war was declared between the United States and Great Britain. A question arose, whether this was a case of salvage? Mr. J. JOHNSON, by whom the opinion of the court was delivered, stated, that " the fact of the gift was established by a writing under the hand of the commander of the squadron of rigates, in these words, *Je donne au capitaine*, &c., in the language of an unqualified donation, *inter vivos*. In this case, the most natural mode of acquiring a definite idea of the rights of the parties in the subject matter, will be, to follow it through the successive changes of circumstances, by which the nature and extent of those rights were affected :—the capture, the donation, the arrival in the neutral country, and the subsequent state of war. As between belligerents, capture undoubtedly produces a complete devesture of property. Nothing remains to the original proprietor but a mere *scintilla juris*, the *spes recuperandi*. The modern and enlightened practice of nations has subjected all such captures to the scrutiny of judicial tribunals, as the only practical means of furnishing documentary evidence to accompany vessels that have been captured, for the purpose of proving, that the seizure was the act of sovereign authority, and not of mere individual outrage. In the case of a purchase made by a neutral, Great Britain demands the production of such documentary evidence, issuing from a court of competent authority, or will dispossess the purchaser of a ship originally British. 1. *Rob.* 135. The Flad Oyen. Upon the donation, therefore, whatever right might, in the abstract, have existed in the captor, the donee could acquire no more than what was consistent with his neutral character to take. He could be in no better situation than a prize master, navigating the prize in pursuance of orders from his com-

mander. The vessel remained liable to British recapture on the whole voyage: and on her arrival in a neutral territory, the donee sunk into a mere bailee for the British claimant, with those rights over the thing in possession which the municipal law (civil and common) gives for care and labour bestowed upon it. The question then recurs, is this a case of salvage? On the negative of the proposition it was contended, that it is a case of forfeiture under the municipal law, and, therefore, not a case of salvage. as against the United States; that it was an unneutral act to assist the French belligerent in bringing the vessel *infra pœesidia*, or into any situation where the rights of capture would cease; and, therefore, not a case of salvage as against the British claimant. But, the court entertains an opinion unfavourable to both those objections. This could not have been a case within the view of the legislature when passing the non-importation act of March, 1809. The ship was the plank on which the shipwrecked mariners reached the shore; but to have cast into the sea the cargo, the property of a belligerant, would have been to do him an injury, by taking away the chance of recovery, subject to which they took it into their possession. Besides, bringing it into the United States does not necessarily presuppose a violation of the non-importation laws. If it came within the description of property

cast casually on our shores, as the court is of opinion it did, legal provision existed for disposing of it, in such a manner as would comport with the policy of those laws. At last, they could but deliver it up to the hands of the government, to be re-shipped by the British claimants, or otherwise appropriated under the sanction of judicial process. And such was the course that they pursued. Far from attempting any violation of the laws of the country, upon their arrival they delivered it up to the custody of the laws, and left it to be disposed of under judicial authority. The case has no feature of illegal importation, and cannot possibly have imputed to it the violation of municipal law. As to the question arising on the interest of the British claimants, it will, at this time, (war having supervened,) be a sufficient answer, that they who have no rights in this court cannot urge a violation of their rights against the libellants. But there is still a much more satisfactory answer. To have attempted to carry the vessel *infra prœsidia* of the enemy, would, unless it could have been excused on the ground of necessity, have been an unneutral act. But where every exertion is made to bring it into a place of safety, in which the original right of the captured would be revived, and might be asserted, instead of aiding his enemy, it is doing an act exclusively resulting to the benefit of the British claimant." A sal

vage of one half was allowed by the court, and as to the residue, it was determined that it must stand on the same footing with other property found within the territory at the declaration of war, and might be claimed upon the termination of war, unless previously confiscated by the sovereign power. The court, therefore, made such order respecting it as would preserve it, subject to the will of the court, to be disposed of as future circumstances might render proper.